IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 29, 2015 Session

**IN RE ABBIGAIL C.**

**Appeal from the Juvenile Court for Claiborne County**
**No. 2012JV1119     Robert M. Estep, Judge**

_____

**No. E2015-00964-COA-R3-PT**
**FILED-OCTOBER 21, 2015**

_____

Father appeals the termination of his parental rights. After a thorough review of the record, we reverse as to the ground of substantial noncompliance with the permanency plan, vacate as to the grounds of abandonment by failure to visit and support by an incarcerated parent, and affirm as to the grounds of abandonment by failure to establish a suitable home and persistent conditions. We also affirm the trial court's finding that termination is in the child's best interest. Accordingly we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part; and Vacated in Part**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and BRANDON O. GIBSON, J., joined.

George Edward S. Pettigrew, Cumberland Gap, Tennessee, for the appellant, Travis C.

Herbert H. Slatery, III, Attorney General and Reporter; Rebekah A. Baker, Senior Counsel, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**Background**

This appeal concerns the termination of Father's parental rights to Abbigail C. ("the child" or "Abbigail").[1] Abbigail was born in December 2010 to Ashley S. ("Mother") and Respondent/Appellant Travis C. ("Father").[2] The child has three step-siblings who all resided in the home of Mother and Father in Claiborne County, Tennessee. The child and her siblings first came to the attention of Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") in December 2012, when DCS filed a petition for a non-custodial order controlling conduct and for protective supervision. According to the petition, DCS received several referrals that the children were unsupervised and that Mother was dealing with mental health issues. On December 12, 2012, the trial court granted DCS's petition.

The issues that first concerned DCS, however, did not improve. Instead, it appears that DCS received another referral with regard to the children, this time alleging that Father was abusing drugs. On or around December 28, 2012, Father was required to submit to a urine drug screen, which tested positive for THC,[3] benzodiazepines, and oxycodone. Although the children were left in the home, Father was permitted only supervised visitation with the children. On January 2, 2013, however, both parents were arrested on child abuse charges, and all four children were removed to DCS custody. At the time of the removal, Abbigail was two years old. All four children have remained continuously in DCS custody since their removal in January 2013.

Accordingly, on January 4, 2013, DCS filed a petition for temporary legal custody of the children. The trial court granted a protective custody order on January 20, 2013. In the order, the trial court granted temporary legal custody of all the children to DCS.

Father subsequently pleaded guilty to child abuse and endangerment charges with regard to the incidents in Tennessee and was sentenced to probation. However, on January 20, 2013, Father was extradited to Nebraska to face prior charges of theft, violation of probation, and domestic violence. Father remained incarcerated while, on January 24, 2013, DCS helped Mother and Father create a permanency plan, which was ratified by the trial court on February 13, 2013. On February 20, 2013, the trial court entered an order finding clear and convincing evidence that the child was dependent and neglected and confirming that the child would remain in the temporary custody of DCS.

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] This appeal concerns only the termination of Father's parental rights. Accordingly, we will only refer to Mother to ensure a full recitation of the facts.

[3] THC is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana. *Interstate Mech.Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

Although his charges were pending, on February 14, 2013, Father was released from custody in Nebraska. He thereafter resided with his aunt and mother in Nebraska. On February 20, 2013, Father returned to Tennessee to visit the child before returning to Nebraska. Father did not visit the child again after that time. Father did send her letters and pictures; however, the child never received these letters due to concerns expressed by the children's counselor, discussed *infra*.

During this time, Mother and Father were maintaining telephone contact with the children. At some point, however, one of the older children became quite upset after a call with Mother.[4] Accordingly, on April 24, 2013, the trial court entered an order suspending Mother's and Father's right to have telephone communication with the children and ordering that all future visitation occur in a therapeutic setting. Although there is no specific order appointing Father an attorney prior to the filing of the termination petition, the trial court's order indicates that Father's current attorney was present for the judicial review hearing that resulted in the April 2013 limited visitation order. Other documents in the record indicate that Father was represented by his current counsel throughout the proceedings.

On December 2, 2013, DCS filed a petition to terminate the rights of Mother and Father in the Claiborne County Juvenile Court. The trial on DCS's petition took place on October 24, 2014 and April 21, 2015. Father appeared telephonically, but Mother was not present for either hearing. Dawn Lewis, the DCS caseworker originally assigned to the case, testified about the children's condition when they were removed from Mother's and Father's home. According to Ms. Lewis, the children were dirty, covered in head lice, and visibly undernourished.[5] A DCS investigator, however, testified earlier in the trial that the children were not visibly neglected at the time of the initial investigation. Regardless, Ms. Lewis testified that it took four pizzas to feed the children the night they were removed.

Ms. Lewis also testified about her efforts to keep in contact with Mother and Father after the children were removed. Ms. Lewis testified that she had contact initially with Mother and Father, as well as Mother's father and Father's mother. In this contact, Ms. Lewis attempted to explain the Permanency Plan and to establish that Father's mother's home (where Father planned to reside after his release from incarceration) in Nebraska was a suitable placement for the child.[6] Ms. Lewis, however, subsequently lost contact with the parties and did not receive sufficient information to have Father's mother's home approved

---

[4] It appears Mother cursed the child and blamed her for the children being in DCS custody.

[5] Ms. Lewis admitted that, of the four children, Abbigail appeared to be the most well-cared-for.

[6] Prior to the termination hearing, Father's mother filed an intervening petition for custody of the child. It appears from the record that Father's mother subsequently died, and the petition was dismissed for failure to prosecute by the juvenile court.

as a placement for the child. Nevertheless, Ms. Lewis submitted the documentation to have Father's mother's home approved, but the home was rejected due to insufficient information.

Father testified telephonically. Throughout his testimony, Father maintained that he loved and cared for all of the children, not just Abbigail. Father testified that after he was extradited to Nebraska to face charges, he was released on bond pending a final resolution. During this time, however, he was under a court order not to leave the state. Father testified that he received special permission to make one visit with the child in February 2013. After that time, Father testified that he did not have the funds or the permission to visit any additional times.

Father admitted that he was currently incarcerated in Nebraska on convictions for theft, domestic violence, and failing to appear. Father's sentence began on October 26, 2013. Since that time, Father has been transferred to several different prisons, apparently due to his good behavior. Father testified that he hoped to be paroled in September 2015 but admitted that his sentence would not expire until April 2017. Father also admitted that there was a warrant for his arrest in Tennessee for a violation of probation that occurred after he was extradited to Nebraska. This probation violation appears to stem from Father's conviction for child abuse related to the events that occurred in December 2012. In addition, Father admitted to a prior conviction for driving while intoxicated.

With regard to Father's drug test, Father testified that he had a prescription for the benzodiazepines and oxycodone. No prescriptions, however, were ever offered to either DCS or the trial court. Father also testified that he had used marijuana "off and on" for his entire adult life but maintained that he had never abused drugs while the children were present.

According to Father, although he was sent the Permanency Plan and was aware of several tasks required by it, DCS never offered any assistance to him in completing the tasks. Father testified at one point that he had no contact with Ms. Lewis during her tenure as caseworker on the case, but later admitted that both he and his mother had some contact with Ms. Lewis. Father maintained, however, that Ms. Lewis was generally non-responsive to his calls. Father testified that it was his understanding that the Permanency Plan required that he participate in a parenting class, participate in a mental health assessment, participate in an alcohol and drug assessment, maintain stable employment and income, follow any recommendations that resulted from the assessments, and not incur new criminal charges. Father testified that at the time of trial he had completed, or was in the process of completing, several parenting classes, a mental health assessment, and a drug and alcohol assessment. Father testified that none of the assessments resulted in any recommendations for Father to follow. Father further testified that he signed releases for DCS to receive certificates of completion regarding all of these tasks. There was no dispute that DCS did receive a

4

certificate of completion for an online parenting class that was completed prior to the filing of the termination petition.

Father also testified without dispute that despite being incarcerated, he has steady income and has been paying child support. At the second hearing, Father submitted proof from the State of Nebraska that his wages had been garnished to pay child support for Abbigail and that Father was current on all his obligations. It appears, however, that the child's Mother retained these payments and they were never sent to Tennessee for Abbigail's benefit. Regardless, nothing in the record suggests that Father was aware that the payments were being retained by Mother.

With regard to the period of time Father spent in Nebraska prior to his current incarceration, however, Father testified that he was unable to pay support because he had difficulty getting and keeping a job due to his criminal record and pending charges. According to Father, this fact also prevented him from making the expensive trip from Nebraska to Tennessee to visit the child. Further, although Father was entitled to therapeutic visitation with the child, Father testified that he was under the impression that he was not able to contact the child because of what he described as a "No Contact" order. Additionally, Father admitted that during this time he was arrested for charges related to a theft, but testified that he was not involved with that crime and that those charges were eventually "dropped."

Father also testified to the efforts he has made to better himself while in prison. According to Father, he is enrolled in several college courses and will shortly be a certified paralegal. Father testified that every effort he has made while incarcerated is to provide a good life for the child upon his release.

Rachel Hunter, another DCS caseworker, also testified. According to Ms. Hunter, she was assigned the case in June 2014. She testified that she was unable to find contact information for Father until October 2014. During that time, Ms. Hunter testified that no one associated with the case contacted her to obtain a home study for the home in Nebraska or for any other purpose. Ms. Hunter did not contact Father even when she learned his whereabouts, however, because after the first hearing on the termination petition on October 24, 2014, she employed a policy of "hush hush" in communicating with Father.[7] Ms. Hunter also testified that the only proof she received regarding Father's compliance with the Permanency Plan was a certificate from a short online parenting class, which she testified was insufficient to meet the requirements outlined in the Permanency Plan.

---

[7] From her testimony, it appears that under this policy, Ms. Hunter declined to make any contact with Father despite the fact that she had his contact information.

Ms. Hunter testified without objection to several disclosures made to her by the older children. For example, one child told Mr. Hunter about an episode where Father set a bed on fire with the children in it, and another child stated that Father hit him with a belt. Ms. Hunter testified that she had personally observed scars on the child's torso and back. Ms. Hunter also testified that all of the children expressed their desire not to return to Mother's and Father's custody. In fact, Ms. Hunter testified that the children appeared frightened at the prospect of leaving their foster home.

Melissa Harris, a licensed professional counselor, also testified to her involvement with the children. Ms. Harris testified that she began seeing the children in February 2013, both collectively and individually. Ms. Harris testified, however, that she had only worked with Abbigail since September 2014, due to her young age. Ms. Harris testified that the children had disclosed several instances of abuse to her during their therapy sessions, including the incident where Father set the bed on fire and where Father beat an older child with a belt. Ms. Harris also testified to an incident described by an older child where Father:

> st[uck] underwear in his mouth one time for what [the older child] presumes was back talking or arguing with him about something. [The older child] said that he was gagging on the underwear, that they were dirty underwear, that he couldn't breathe, he couldn't swallow, he couldn't say anything, and that his mom stood back and was laughing at him while this was going on. If he attempted to take the underwear out of his mouth, that [Father] would smack him.

Ms. Harris stated that another child explained how he had to break into Mother's and Father's home because he was locked outside. When he went inside he tried to wake Mother, but "she smacked at him." The older child then "went into the kitchen and got a piece of bologna and a piece of cheese that they all four shared." The child also reported that Father made him drink alcohol on two different occasions.

Ms. Harris testified that the children had several issues when they were first removed from Mother's and Father's home, including aggression, bathroom issues,[8] self-blaming, and lack of self-esteem. With regard to Abbigail specifically, Ms. Harris testified without objection:

---

[8] These issues include an older child using the bathroom on himself and using the bathroom in the shower.

She was obviously drug exposed in utero. And, so, she has a lot of the behaviors that comes along with that; the aggression, the very impulsive behaviors, using the bathroom on, on herself, not sleeping well, a lot of profanity. And we're working on her understanding what her role is, accepting what she can and cannot do, and listening to rules and structure from other people.

Because of the issues that the children were experiencing, Ms. Harris testified that she supported discontinuing phone visitation between the children and Mother and Father. Ms. Harris also testified that she recommended that the children not receive letters from Mother and Father, as the letters would cause the children unnecessary stress.[9] Indeed, Ms. Harris testified that Abbigail had a noticeable stress reaction whenever Father was mentioned. Ms. Harris testified, however, that she advised that therapeutic visitation would be appropriate, but that neither Mother nor Father ever contacted her to facilitate any visitation. According to Ms. Harris, she obtained DCS approval before beginning the counseling with the children and specifically asked DCS that Mother and Father be informed that they should contact her to discuss the children's therapy or to facilitate therapeutic visitation.

Ms. Harris testified that, through therapy and the structure provided in their foster home, all of the children have improved markedly. Ms. Harris also testified that the children had bonded with their foster parents and removing the children from foster parents would cause them harm.

Norma B., the children's foster mother ("Foster Mother") mirrored Ms. Harris's testimony regarding the children's allegations of abuse, their resulting emotional and behavioral issues, and the progress they have made since coming to her home. All of the children were placed with Foster Mother immediately after being removed from Mother's and Father's custody and have remained there continuously since that time. Foster Mother testified that she and her husband hope to adopt the children, should they become available for adoption.

Specifically with regard to Abbigail, Foster Mother testified that Abbigail initially "cussed like a sailor" and threw tantrums in order to "get a response." Abbigail also had such trouble sleeping that she had to be prescribed medication. However, Foster Mother testified that those habits are getting better with time. According to Foster Mother, none of the children ever expressed any sadness over being taken from Mother and Father. Instead, Foster Mother testified that Abbigail refers to her as "Mama." Additionally, Foster Mother testified that she never received any support from Mother or Father for the children's care.

---

[9] Ms. Harris also noted that Abbigail had not yet learned to read at the time of trial.

7

After the close of proof, DCS offered the trial court the Tennessee Supreme Court's recently decided Opinion in *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015), which DCS argued removed DCS's obligation to prove reasonable efforts as a precondition to termination. Father objected, asserting that the ***Kaliyah*** holding should not be applied retroactively. The trial court indicated that it would consider both parties' arguments.

The trial court issued a Memorandum Opinion on April 15, 2015. Thereafter, on May 28, 2015, the trial court filed a written order containing detailed findings of fact and conclusions of law, which terminated Father's parental rights to Abbigail on the grounds of abandonment by failure to provide a suitable home, abandonment by an incarcerated parent for failure to visit and support and wanton disregard, substantial noncompliance with the permanency plan, and persistence of conditions. The trial court also found it was in Abbigail's best interest to terminate Father's parental rights. Father filed a timely notice of appeal.

## Issues Presented

Father raises several issues on appeal, which are taken from his appellate brief:

1. Whether the juvenile court's judgment is final.
2. Whether the juvenile court erred by failing to enter a final order within thirty days of the final hearing in this matter.
3. Whether the juvenile court made evidentiary errors in admitting Collective Exhibit 1 and relying upon it.
4. Whether the juvenile court erred in weighing alleged statements from absent minor declarants without articulating the reasons it assigned credibility to the statements.
5. Whether the juvenile court erred in considering opinion evidence from a witness for the State who was not tendered as an expert witness.
6. Whether the juvenile court erred in finding that clear and convincing evidence established the ground of abandonment.
7. Whether the juvenile court erred in finding that there was clear and convincing evidence to establish substantial noncompliance with the permanency plan by Father.
8. Whether the juvenile court erred in finding that there was clear and convincing evidence to establish the ground of persistent conditions.

9. Whether the juvenile court erred in finding that termination was in the child's best interest;
10. Whether the juvenile court violated Father's due process rights by considering new case law not in effect at the time the termination petition was filed;
11. Whether the cumulative effect of the juvenile court's errors warrant vacating the termination.

## Discussion

### Subject Matter Jurisdiction

Father first argues that this Court lacks subject matter jurisdiction to consider this appeal because the trial court's judgment is not final. Subject matter jurisdiction concerns the authority of the court to hear a matter and cannot be waived. ***Meighan v. U.S. Sprint Commc'ns Co.***, 924 S.W.2d 632, 639 (Tenn. 1996). The Tennessee Supreme Court has held that "[u]nless an appeal from an interlocutory order is provided by the rules or by statute, appellate courts have jurisdiction over final judgments only." ***Bayberry Assocs. v. Jones***, 783 S.W.2d 553, 559 (Tenn. 1990). Rule 3(a) of the Tennessee Rules of Appellate Procedure limits the subject matter jurisdiction of appellate courts to final judgments:

> In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right. Except as otherwise permitted in rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties.

Accordingly, if the trial court did not adjudicate all of the parties' claims, it did not enter a final judgment. Without a final judgment, this Court does not have subject matter jurisdiction.

In this case, there is no dispute that the termination action involved claims against multiple parties. The order terminating Father's parental rights to the child did not adjudicate all of the claims. However, the trial court's order contains a certification pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure indicating that the claims against Father are

9

final and that there is no just reason to delay appellate review. Rule 54.02 of the Tennessee Rules of Civil Procedure provides, in pertinent part:

> When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

The trial court's order terminating Father's parental rights adjudicates all of the claims related to Father and is properly certified as final pursuant to Rule 54.02. Despite this fact, Father argues that the Rule 54.02 certification was inappropriate because no such language was included in the trial court's Memorandum Opinion, which preceded the filing of the purported final order. We respectfully disagree. The trial court's Memorandum Opinion clearly contemplated that the trial court's judgment should become final once an order incorporating the trial court's findings of fact and conclusions of law was filed. Indeed, the trial court specifically anticipated that an appeal would be filed after the entry of an order incorporating the Memorandum Opinion. Because the trial court's final order contains Rule 54.02 certification and the trial court speaks through its order, *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977), we must conclude that the order terminating Father's parental rights was properly certified as final pursuant to Rule 54.02. Consequently, this Court has jurisdiction to consider this appeal.

### Tennessee Code Annotated Section 36-1-113(k)

Father next argues that the trial court's judgment should be reversed due to its failure to comply with Tennessee Code Annotated Section 36-1-113(k). Section 36-1-113(k) provides, in pertinent part:

> The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing. If such a case has not been completed within six (6) months from the date the petition was served, the petitioner or respondent shall have grounds to request that the court of appeals grant an order expediting the case at the trial level.

Here, the trial concluded on April 21, 2015. The trial court issued its Memorandum Opinion on May 15, 2015. However, the order terminating Father's parental rights was entered on May 28, 2015, approximately seven days after the expiration of the thirty-day time period outlined in Tennessee Code Annotated Section 36-1-113(k). Although the trial court failed to strictly comply with the thirty-day timeline, Father did receive notice of the trial court's ruling within the statutory timeframe. Indeed, he filed his notice of appeal before the entry of the final order, despite the trial court's statement in the Memorandum Opinion that the time period for filing a notice of appeal would not begin until the filing of the final order. Additionally, this Court has previously held that a trial court's failure to strictly comply with Tennessee Code Annotated Section 36-1-113(k) did not warrant remand to the trial court, much less the reversal that Father requests in this case, where the trial court made appropriate findings of fact and conclusions of law to support its ruling. *In re Isobel V.O.*, No. M2012-00150-COA-R3PT, 2012 WL 5471423, at *4 (Tenn. Ct. App. Nov. 8, 2012) ("We repeatedly have held that the time frame contained in the statute reflects the legislature's intent that parental termination cases be handled in an expeditious manner and is not mandatory.") (citing *In re Zada M.*, No. E2010-02207-COA-R3-PT, 2011 WL 1361575, at *5 (Tenn. Ct. App. Apr. 11, 2011)). We have thoroughly reviewed the trial court's order and conclude that other than on one issue, discussed *infra*, the order contains sufficient findings of fact and conclusions of law. This issue is, therefore, without merit.

### Evidentiary Rulings

Father next argues that the trial court erred in several evidentiary rulings and that the wrongly admitted evidence was improperly relied upon by the trial court. A trial court's evidentiary rulings are reviewed under the abuse of discretion standard. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 87 (Tenn. 2008). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* (quoting *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006))). We will consider each of Father's evidentiary arguments in turn.

### A. Admission of Collective Exhibit #1

11

Father first argues that the trial court erred in admitting Collective Exhibit #1, over his objection, during DCS's opening statement. Collective Exhibit #1 consists of the certified court records pertaining to the children. Certain documents are self-authenticating; that is, they do not require "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility." Tenn. R. Evid. 902. According to Rule 902(4) of the Tennessee Rules of Evidence, such self-authenticating documents include:

> A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office (including data compilations in any form), certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any Act of Congress or the Tennessee Legislature or rule prescribed by the Tennessee Supreme Court.

The documents contained in Collective Exhibit #1 consist entirely of certified court records, and the documents were certified as correct by the Claiborne County Juvenile Court Clerk. Thus, despite Father's protestations in his appellate brief, the documents did not require that a witness be present and testify to their authenticity.

We agree with Father that the better practice is that evidence should not be admitted during the opening statement phase of trial. *See generally* ***State v. Sexton***, 368 S.W.3d 371, 414-15 (Tenn. 2012), *as corrected* (Oct. 10, 2012) (discussing the purpose of opening statements). However, because the documents consisted only of properly certified official court records that were clearly admissible under the Tennessee Rules of Evidence, these documents were admissible without the need for an authenticating witness. Under these circumstances, we must conclude that the trial court's decision to admit the documents during opening statements was not error. Furthermore, because the documents were admissible, we find no error in the trial court's reliance on Collective Exhibit #1 in its ruling.

### B. Statements by the Children

Father next argues that the trial court erred in admitting and considering hearsay statements from the children regarding their treatment at the hands of Father and Mother. As previously discussed, both Ms. Harris and Foster Mother testified as to several statements made by the children concerning physical abuse and neglect that they endured while in the custody of Father and Mother. Father argues: (1) that DCS failed to elicit sufficient evidence to admit the hearsay statements pursuant to Rule 803(25) of the Tennessee Rules of

Evidence;[10] (2) that the trial court failed to "determine[] the child[ren's] ability to understand the truth or a lie" before admitting the statements; and (3) that the trial court failed to require that the children be sworn in pursuant to Rule 603 of the Tennessee Rules of Evidence.[11]

We have thoroughly reviewed the trial transcript and have found no objections of any kind lodged by Father regarding the statements attributed to the children. Rule 36(a) of the Tennessee Rules of Appellate Procedure provides, in relevant part: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The Advisory Committee Comment to this Rule clarifies that the above rule "is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." As explained by this Court:

> The contemporary objection rule is an elementary principle of trial practice. Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). Parties cannot obtain relief on appeal from an alleged error they could have prevented. Tenn. R. App. P. 36(a).

---

[10] Rule 803(25) provides:

> **Children's Statements.** Provided that the circumstances indicate trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning issues of dependency and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12), issues concerning severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21), or issues concerning termination of parental rights pursuant to Tenn. Code Ann. § 37-1-147 and Tenn. Code Ann. § 36-1-113, and statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse offered in a civil trial relating to custody, shared parenting, or visitation. Declarants of age thirteen or older at the time of the hearing must testify unless unavailable as defined by Rule 804(a); otherwise this exception is inapplicable to their extrajudicial statements.

[11] Rule 603 provides:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.

Therefore, failing to make an appropriate and timely objection to the admission of evidence in the trial court prevents a litigant from challenging the admission of the evidence on appeal. ***Welch v. Bd. of Prof'l Responsibility***, 193 S.W.3d 457, 464 (Tenn. 2006); ***State ex rel. Smith v. Livingston Limestone Co.***, 547 S.W.2d 942, 944 (Tenn. 1977); ***Ottinger v. Stooksbury***, 206 S.W.3d 73, 78 (Tenn. Ct. App. 2006).

***Levine v. March***, 266 S.W.3d 426, 440 (Tenn. Ct. App. 2007). Because Father did not object to the admission of these statements during the trial, he cannot raise their admission and the trial court's subsequent reliance on them as an error on appeal.

### C. Ms. Harris's Expert Opinion

Father next argues that the trial court erred in admitting and considering the expert opinion of Ms. Harris, a licensed psychologist, because she was not tendered as an expert. We first note that this Court held that the Tennessee Rules of Evidence contain no requirement that a witness must be tendered as an expert before testifying. *See **Tire Shredders, Inc. v. ERM-N. Cent., Inc.***, 15 S.W.3d 849, 863 (Tenn. Ct. App. 1999) ("[Appellant] does not, however, direct us to any authority in Tennessee requiring the formal tender of a witness prior to the giving of expert testimony. Nor has our independent research revealed any such requirement."). Thus, so long as Ms. Harris's qualifications were sufficient to allow her to testify as an expert, there was no error in DCS's failure to tender her as an expert.

Even more importantly, we again note that Father failed to object to any of Ms. Harris's testimony, including her opinion testimony. As previously discussed, the failure to lodge a contemporaneous objection to the admission of evidence will result in a waiver of any argument concerning the evidence's erroneous admission on appeal. *See **id.*** at 864 ("In order to challenge on appeal a trial court's admission of [expert testimony], there must appear in the record a timely and specific objection to the evidence or motion to strike the evidence."). Thus, this argument is also waived.

### Termination of Father's Parental Rights

Father next argues that the trial court erred in terminating his parental rights, both because there was insufficient evidence to prove grounds for termination and to prove that termination was in the child's best interest. Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d

170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

15

Furthermore, in termination of parental rights cases, Tennessee Code Annotated Section 36-1-113(k) provides that the court "shall enter an order which makes specific findings of fact and conclusions of law." Section 36-1-113(k) is a reflection of the General Assembly's "recognition of the necessity of individualized decisions in these cases." *State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 WL 239759, at \*5 (Tenn. Ct. App. 2004). Because of the gravity of their consequences, proceedings to terminate a parent's rights to his or her children require such individualized decision making. *Id.* (citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). Furthermore, as previously stated by this Court, quoting the Tennessee Supreme Court in *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003):

> The trial court is required to find only one statutory ground for termination of parental rights . . . . However, given the importance of establishing the permanent placement of a child who is the subject of a termination of parental rights proceeding, **the trial court should include in its final order findings of fact and conclusions of law with regard to each ground presented**. If the trial court addresses each ground that is raised in a termination proceeding, the child's permanent placement will not be unnecessarily delayed due to a remand for findings on alternate grounds.

*McBee*, 2004 WL 239759 at \*13–\*14 (citations omitted) (emphasis added). When a trial court fails to comply with Section 36-1-113(k), "we cannot simply review the record *de novo* and determine for ourselves where the preponderance of the evidence lies[.]" *Id.* at \*6.

### A. Grounds for Termination

In this case, DCS alleged several grounds for termination against Father including abandonment, persistent conditions, and substantial noncompliance with the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g) (outlining the grounds for termination of parental rights). We begin with abandonment.

### I. Abandonment

Tennessee Code Annotated Section 36-1-113(g) provides that one ground for termination of parental rights shall be "[a]bandonment by the parent or guardian, as defined in § 36-1-102." The trial court specifically found that clear and convincing evidence supported a finding that Father abandoned his child by failure to establish a suitable home, as well as failure to visit and support and wanton disregard by an incarcerated parent. We will consider each definition in turn.

16

### 1.  Abandonment by Failure to Establish a Suitable Home

Father first argues that the trial court erred in finding that he had abandoned his child by willfully failing to establish a suitable home. Relevant to this argument, Tennessee Code Annotated Section 36-1-102(1)(A)(ii) indicates that abandonment may be found when:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

The trial court made the following findings with regard to this issue:

> The record is mostly void of any evidence to provide a suitable home. Certainly [Father] cannot provide a suitable home while he is incarcerated in the State of Nebraska.

\* \* \*

17

> [Father] testified of a suitable home in the State of Nebraska, owned by his aunt . . . .
>
> The Defense wants to blame the State of Tennessee, Department of Children's Services for lack of reasonable efforts to do a home study of the home in the State of Nebraska owned by [Father's aunt]. However, DCS caseworker Dawn Lewis testified that she had attempted to get information from [Father's mother] to complete the [Interstate Compact on the Placement of Children] When the needed information was not provided she submitted the ICPC with what she had and it was rejected due to not being completed with all of the necessary information. Efforts to reunify require cooperation from both sides. The State of Tennessee, Department of Children's Services is required to undertake reasonable efforts to reunify. However, the parents are also required to make reasonable efforts to reunify. In this particular case, the children came into custody of the State of Tennessee as dependent and neglected children based on the actions of the two (2) parents, [Mother] and [Father].
>
> *   *   *
>
> [Father] engaged in criminal activity such that he placed himself into a position that he became incarcerated in the State of Nebraska.
>
> Therefore, the Court finds that any efforts to try and reunify were made impossible by the actions of the parents.

In his appellate brief, Father's only argument on this ground provides: "Those [findings by the trial court] are not sufficient, factually or legally, to sustain the termination of [Father's] parental rights under the abandonment ground so found by the trial court." Father cites no caselaw to support his argument that the trial court's findings are insufficient.

After a thorough review of the record, we conclude that the trial court's findings are sufficient and that the evidence does not preponderate against them on this issue. First, the record on appeal clearly shows by order of February 20, 2013, the child was found to be dependent and neglected and placed in the custody of DCS. Additionally, there is no dispute that Father is currently incarcerated and his sentence will only expire in 2017.[12] Accordingly,

---

[12] Father testified that he may be eligible for parole in 2015. However, this Court has held that "parole

the trial court correctly found that Father cannot establish a suitable home where he resides. Father asserted at trial, however, that either his mother's or his aunt's home is suitable and that DCS failed to exert reasonable efforts to assist him in establishing those homes as suitable.[13]

We respectfully disagree. Ms. Lewis testified of the multitude of efforts that she expended in order to communicate with Father regarding establishing a suitable home. According to Ms. Lewis, she attempted to obtain the appropriate information to have Father's mother's home approved as a suitable home for the child, but she never received the appropriate information. Ms. Lewis even testified without dispute that she attempted to have the home approved with the information that had been provided, but that the home was rejected.

In contrast, Father's testimony was sometimes contradictory as to how much communication he had with Ms. Lewis. For example, Father specifically testified that other than his meeting with Ms. Lewis in January 2013, DCS "never even spoke with [him]." He later admitted, however, that both he and his mother were in contact with Ms. Lewis after his extradition to Nebraska. Under these circumstances, we cannot conclude that the trial court erred in relying on Ms. Lewis's testimony, rather than Father's. *See **Bouldin v. Warren Cnty. Sheriff's Dep't**, No. M2003-00602-WC-R3-CV, 2004 WL 358275, at \*3 (Tenn. Workers Comp. Panel Feb. 26, 2004) (holding that even an implicit credibility finding is "entitled to considerable deference on appeal") (citing **Tobitt v. Bridgestone/Firestone, Inc.**, 59 S.W.3d 57, 62 (Tenn. 2001)). Based upon Ms. Lewis's testimony, it appears that she made several attempts to gain the appropriate information to establish a suitable home in Nebraska, but that her efforts were thwarted by her inability to keep in contact with Father and his mother. In addition, the lack of communication with Father can be attributed to Father's incarceration, which was the product of his own poor choices. Under these circumstances, we affirm the trial court's finding that despite DCS's reasonable efforts, the ground of abandonment by failure to establish a suitable home was met by clear and convincing evidence.

## 2. Abandonment by Incarcerated Parent

Father next argues that the trial court erred in finding clear and convincing evidence to support the ground of abandonment by an incarcerated parent. Tennessee Code Annotated Section 36-1-102(a)(iv) provides that abandonment may be shown by proving that:

---

eligibility does not equate with release, but only with the possibility of release." *In re M.B.*, No. M2007-02755-COA-R3-PT, 2008 WL 2229518, at \*5 (Tenn. Ct. App. May 29, 2008). Accordingly, we will consider the date that Father is certain to be released.

[13] The record is somewhat unclear as to whether Father's mother and aunt resided in the same home or resided in separate, but adjoining homes.

19

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

This Court has indicated that the above definition "contains multiple ways of abandonment for termination of parental rights." *In re Kierra B.*, No. E2012-02539-COA-R3PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014). In this case, the trial court found that abandonment by an incarcerated parent was proven by showing willful failure to visit and support, as well as wanton disregard.

One required element of the ground of abandonment by an incarcerated parent requires that the "parent or guardian is incarcerated at the time of the institution of an action. . . or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action[.]" Tenn. Code Ann. 36-1-102(a)(iv). A brief review of Father's incarceration record is helpful in determining this issue. According to the record, Father and Mother were both arrested in January 2013 for child abuse charges. Father was then extradited to Nebraska but was released pending a final determination of his charges on February 20, 2013. Father was not incarcerated between February 20, 2013 and October 26, 2013, other than a few days.[14] On October 26, 2013, however, Father began his current incarceration. Thus, at the time of the filing of the termination petition on December 2, 2013, Father was incarcerated and had been for a little over a month. Accordingly, the first element necessary to a finding of abandonment under Tennessee Code Annotated Section 36-1-102(a)(iv) has been met. We will, therefore, go on to consider whether the trial court erred in finding that the ground of abandonment by an incarcerated parent was shown by willful failure to visit and support and wanton disregard.

### a. Willful Failure to Visit and Support

---

[14] The record is somewhat unclear as to why Father was incarcerated during this time. Father testifies at one point that it was due to a paperwork error and at another point that it was due to an erroneous theft charge.

Father next argues that the trial court erred in finding abandonment by an incarcerated parent through willful failure to visit and support because there was insufficient evidence that Father's failure was willful. Willful failure to visit is defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. 36-1-102(E). Willful failure to support or willful failure to make reasonable payments toward such child's support is defined as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child[.]"

As outlined above, in order to determine whether a parent has willfully failed to visit or support a child, the court must consider the proper four-month period. *See generally **In Matter of M.J.J.***, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *5 (Tenn. Ct. App. Apr. 14, 2005) (noting the "relevant four month period that we must be concerned with"). In the trial court's order, the trial court states that "the applicable four (4) month time period immediately prior to the filing of the Petition covers the timeframe between August 2013 and December 2013." Likewise in his brief, Father argues that his failure to visit and support was not willful because he was incarcerated during a portion of the relevant four-month period.

Respectfully, we must conclude that both the trial court and Father have miscalculated the relevant four-month period in this case. Under Tennessee Code Annotated Section 36-1-102(a)(i), the relevant four-month period for determining willful failure to visit or support is the "four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent." This is the relevant period utilized by both the trial court and Father. The trial court's order, however, does not terminate Father's rights upon the ground contained in Tennessee Code Annotated Section 36-1-102(a)(i), but instead upon the ground contained in Tennessee Code Annotated Section 36-1-102(a)(iv). Subsection (iv) provides that the relevant period for determining abandonment by an incarcerated parent for failure to visit or support is the "four (4) consecutive months immediately preceding such parent's or guardian's incarceration." *Id.* Thus, the relevant period for this ground is June 26, 2013 to October 25, 2013.

This Court has indicated that where the grounds of abandonment by an incarcerated parent for willful failure to visit and support are properly alleged in the termination petition, but the trial court relied on the wrong four-month period, the "omission . . . require[s] us to [vacate and] remand for findings on that issue." *In re W.B.*, IV, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *10 (Tenn. Ct. App. Apr. 29, 2005). Here, the termination petition clearly contains allegations regarding the grounds of abandonment by an incarcerated parent through willful failure to visit and support. Accordingly, we must vacate the trial court's determination with regard to these grounds. *See also **McBee***, 2004 WL 239759 at *6) (noting that when a trial court fails to make findings of fact on an issue "we cannot simply

21

review the record *de novo* and determine for ourselves where the preponderance of the evidence lies"). As discussed throughout this Opinion, however, other grounds exist to terminate Father's parental rights. In addition, as discussed, *infra*, we have affirmed the trial court's determination that termination is in the child's best interest. Thus, a finding that clear and convincing evidence exists to support the grounds of abandonment by an incarcerated parent through failure to visit and support is not necessary to uphold the termination of Father's parental rights. Under these circumstances, remanding for reconsideration of these grounds would only further prolong these proceedings without altering the outcome. Accordingly, we decline to remand this issue to the trial court for reconsideration.

### b. Wanton Disregard

Father next argues that the trial court erred in finding abandonment by an incarcerated parent through wanton disregard because the trial court's order "lacks any specific findings as to what willful actions, if any, of [Father] legally establish 'wanton disregard.'" With regard to this ground, the trial court found:

> [Mother] and [Father] have been in and out of jail since the children were brought into state's custody. They each have a lengthy criminal history and outstanding warrants in Claiborne County, Tennessee. [Father] has a range of convictions, including recent ones of Domestic Assault (which included no contact with [Mother]), Felony Failure to Appear, and Theft. [Father] is presently incarcerated in Jefferson County, Nebraska.
>
> * * *
>
> [Father] became incarcerated in October 2013 approximately two (2) months prior to the filing of the Petition to Terminate Parental Rights. However, [Father] was under bond conditions to not leave the State of Nebraska commencing in January 2013 that did not allow him to return to the State of Tennessee to retrieve his children. The criminal activity by [Father] was willful. Therefore, such criminal activity exhibits a wanton disregard for the welfare of [the child].
>
> It simply is not the fault of [the child] that her father . . . chose to participate in criminal activity such that he received a jail sentence causing him to be extradited back to the State of Nebraska, to have bond conditions imposed that did not allow him to leave the State of Nebraska and become incarcerated in October 2013 and remain incarcerated through a[n] initial

22

hearing on October 2014 and a final hearing in April 2015. By his own testimony he becomes eligible for parole in September 2015. However, [the child] still has needs just as she has since she was born [in December 2010].

The State of Tennessee, Department of Children's Services and the foster parents have provided those needs for [the child] while the parents, [Father] and [Mother], were unable to provide those needs due to their criminal activities.

With regard to the ground of abandonment by an incarcerated parent through wanton disregard, this Court has explained:

Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, *State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.

*In re C.A.H.,* No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

Here, Father admitted that he had a lengthy criminal history, including convictions for domestic violence, driving while intoxicated, child abuse/neglect, theft, and failure to appear. In addition, Father admitted that there is a warrant for his arrest in Tennessee due to charges that he violated his probation. Due to this criminal activity, Father has been unable to visit his child since February 2013, either due to incarceration or his inability to find work due to his criminal record and pending proceedings. Father's decision to engage in criminal activity is all the more troubling given his admission that Mother was unable to properly care for the children on her own, despite her efforts. Thus, Father chose to engage in criminal activity that could prevent him from caring for his child despite the fact that he was aware that the child's other parent was not capable of parenting the child alone.

Father was also tested for drugs in December of 2012 and tested positive for THC, benzodiazepines, and oxycodone. Father testified that he had been prescribed Xanax (a benzodiazepine) and pain medication, but no documentation was offered in the record to support these prescriptions. Moreover, Father did not testify as to what conditions, other than a generalized allegation of pain, the medications were allegedly prescribed to address. In addition, Father admitted that he had abused marijuana "off and on" his entire adult life but testified that he was never impaired by marijuana around the children.

Finally, when the child first came under DCS supervision, one of her siblings was found to be unsupervised, and all of the children were generally neglected.[15] Indeed, both Ms. Lewis and Foster Mother testified that the children were undernourished in Father's and Mother's care. Under these circumstances, we must conclude that Father's criminal history, coupled with his admitted drug abuse and neglect of the child while in his custody, are sufficient to support the trial court's determination that clear and convincing evidence supported the ground of abandonment by an incarcerated parent through wanton disregard.

## II. Substantial Noncompliance with the Permanency Plan

We next consider the trial court's finding that Father failed to substantially comply with the Permanency Plan. Tennessee Code Annotated Section 36-1-113(g)(4) provides that a ground for termination exists where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the

---

[15] Testimony showed, however, that the child at issue appeared to have been better treated than the other children in the home.

provisions of title 37, chapter 2, part 4[.]" Further, Tennessee Code Annotated Section 37-2-403 provides, in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated Section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under Section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.,* No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

Father argues that there was no basis for the trial court to conclude that he had not complied with the Permanency Plan, as he contends that the Permanency Plan was never entered into evidence. Indeed, this Court has repeatedly held that when a party "is relying on substantial noncompliance with the permanency plan as a ground for terminating parental rights, it is essential that the plan be admitted into evidence." *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *4 (Tenn. Ct. App. Nov. 28, 2006) (citing *Dep't of Children's Services v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *3 (Tenn. Ct. App. June 29, 2005)). Furthermore, this Court has held that it is "inappropriate to terminate parental rights based on the ground of substantial noncompliance . . . where DCS did not take the child into State protective custody, did not create a 'permanency plan' that satisfied the requirements of the statute, [and] did not obtain court approval of any permanency plan. . . ." *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *21 (Tenn. Ct. App. Mar. 12, 2013).

In this case, however, a copy of the Permanency Plan was entered as a part of Collective Exhibit #1. The Permanency Plan was ratified by the trial court on February 13, 2013, and the copy in the record is certified by the Juvenile Court Clerk. Father also admitted to receiving a copy of the Permanency Plan in his testimony. Although Father argues that the trial court was not entitled to rely on Collective Exhibit #1, we have previously concluded that it was admissible, and the trial court was entitled to rely on upon the documents contained therein.

Father next argues that the trial court erred in finding that Father substantially failed to comply with the Permanency Plan ratified by the trial court. On this issue, the trial court made the following findings:

> The Court does note that [Father] appears to have made much effort in an attempt to comply with the Family Permanency Plan requirements for parenting classes, alcohol and drug assessments and mental health assessments.
> The documentation of his efforts, however, is not complete. Evidence of completion of some parenting classes was introduced at trial. However, there is no evidence of completion of a mental health assessment and following the recommendations, or an alcohol and drug assessment and following those recommendations.
> The Family Permanency Plan also requires safe and stable housing and proof of income.
> At the time of the trial, neither parent could provide proof of safe and stable housing and income as . . . [Father] is incarcerated.
> Therefore, the Court has to find that there has been substantial non-compliance with the Family Permanency Plan by [Father].

Although not pointed out by Father in his brief, we note that some of the requirements found to be contained in the Permanency Plan are not clearly delineated as responsibilities of Father. For example, although the trial court found that Father was required to "provide proof of safe and stable housing," the Permanency Plan indicates that this was merely a "Desired Outcome[]," rather than an action step or responsibility to be undertaken by Father. A similar parenting plan was discussed in *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526 (Tenn. Ct. App. Sept. 14, 2012):

26

Unfortunately, however, the permanency plan for [the child] nowhere includes a section labeled as the "statement of responsibilities" for [the parent]. This omission is not a mere technicality. As we have noted in a previous case: "[T]he statute that sets out this ground for termination states that parental rights may be terminated where there is substantial noncompliance 'with the statement of responsibilities' in the permanency plan." *In re Askia K. B.*, 2011 WL 4634241, at *9 (quoting Tenn. Code Ann. § 36-1-113(g)(2)) (emphasis in original). *See also State of Tenn. Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *8; 2006 Tenn.App. LEXIS 608, at *23–24 (Tenn. Ct. App. Sept. 15, 2006) ("Tenn. Code Ann. § 36-1-113(g)(2) does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities"). Moreover, the statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for [the parent] in the permanency plan is a significant problem. It is difficult for the Court to find that [the parent] failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

*In re Abigail*, 2012 WL 4038526, at *13. Much like the permanency plan in *In re Abigail*, the Permanency Plan here contains various "Desired Outcomes," "Actions Step(s)," and responsibilities littered throughout its twenty-one pages but contains no clear and concise statement of responsibilities. Still, Father testified that he was aware that he was required to participate in a parenting class, complete both an alcohol and drug assessment and a mental health intake assessment and provide documentation to DCS, gain stable income to provide support for the child, as well as not incur more criminal charges. We will, therefore, only consider these requirements.[16]

---

[16] Of these requirements, there is no dispute that the Permanency Plan's actions steps and responsibilities were "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C).

In his brief, Father argues that the trial court's findings are insufficient to support a finding of substantial noncompliance where the trial court made no findings that DCS "made reasonable efforts to assist [Father] (exceeding those efforts made by [Father]) in completing the requirements of the child's permanency plan."[17] In ***In re Kaliyah S.***, 455 S.W.3d 533 (Tenn. 2015), however, the Tennessee Supreme Court recently held that "proof of reasonable efforts is not a precondition to termination of the parental rights." ***Id.*** at 555. Instead, the Tennessee Supreme Court concluded that proof of reasonable efforts should be considered, but not necessarily dispositive, only with regard to a parent's failure to establish a suitable home and the best interest of the child. ***Id.*** at 554 n.29, 555.

Father argues, however, that the holding in ***In re Kaliyah*** should not apply to this case, as to do so would violate his due process rights. Father cites considerable law in his appellate brief regarding the minimal due process rights that he should have been afforded; Father does not, however, discuss why it was inappropriate for the trial court to apply the holding in ***In re Kaliyah***, other than a conclusory assertion that it denied his counsel "adequate trial preparation." In its appellate brief, DCS appears to assume that Father's argument rests upon the principle that "retrospective application of new precedent can operate, in some circumstances, to place an undue burden upon a person who has acted in justifiable reliance upon prior decisions." *See **Marshall v. Marshall***, 670 S.W.2d 213, 215 (Tenn. 1984) (quoting 10 A.L.R.3d 1371, 1386 § 5(b) (1966) ("It has often been held or recognized that where particular persons have acted in justifiable reliance upon a subsequently overruled judicial decision and retroactive application of the overruling decision would defeat their reliance interests, such reliance interests should receive adequate protection, and the overruling decision should be denied retroactive application in order to prevent such persons from being subjected to unfairness or undue hardship.") (citation omitted)). A review of Father's appellate brief, however, reveals that Father cites no authority for his conclusion that the ***In re Kaliyah*** holding should not have retrospective application.[18] This Court has repeatedly held that the failure to include citations to authorities may render issues raised in the appellant's brief waived. *See **Bean v. Bean***, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure . . . to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) [of the Tennessee Rules of Appellate Procedure] constitutes a waiver of the issue.") (citing Tenn. R. App. P. 27(a)(7) (providing that an appellant's brief must contain "[a]n argument . . . with citations to authorities")). Accordingly, Father's argument that the trial court improperly considered the

---

[17] Father also argues that the Parenting Plan was not ratified by the trial court as being in the best interest of the child. As previously discussed, the Parenting Plan was approved by the trial court on February 13, 2013.

[18] Indeed, the phrases "retrospective application," "undue hardship," or their like are not included in Father's appellate brief. In contrast, at trial, Father's counsel did argue that the ***In re Kaliyah*** Opinion was "not retroactive." Instead, in his brief, Father simply assumes that the consideration of ***In re Kaliyah*** was improper and only provides legal argument as to why such consideration caused him harm.

*Kaliyah* Opinion because it was rendered after the initiation of the termination proceedings is waived.

For purposes of clarity, however, we note that, despite Father's argument, it is not at all clear that the trial court in fact applied the holding of *In re Kaliyah* to the facts of this case. Nowhere in the trial court's Memorandum Opinion or final order is *In re Kaliyah* mentioned. Indeed, rather than refuse to consider reasonable efforts, the trial court concluded that reasonable efforts were "made impossible" by Father's actions, specifically his incarceration in Nebraska. Even in cases that required an affirmative showing of reasonable efforts by DCS prior to the decision in *In re Kaliyah*, this Court had held that DCS's affirmative duty to make reasonable efforts could be excused where "such efforts would have been futile under the circumstances."[19] *State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800 (Tenn. Ct. App. 2008), *overruled by* *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Thus, the trial court appeared to apply pre-*Kaliyah* law, exactly as requested by Father.[20] Consequently, despite Father's contention in his brief, the trial was not "irreparably tainted" by DCS's proffer of the *In re Kaliyah* Opinion to the trial court.[21]

---

[19] Father does not argue that the trial court erred in finding that reasonable efforts were excused due to futility. Accordingly, any argument on this issue is waived. *See* Tenn. R. App. P. 13(b) ("Review generally will only extend to those issues presented for review.").

[20] We also note that this Court has previously applied the holding in *In re Kaliyah* to a case initiated prior to the filing of the Opinion in *In re Kaliyah*. *See* *In re J.A.G.*, No. M2014-01469-COA-R3-PT, 2015 WL 1022281, at *4 (Tenn. Ct. App. Feb. 27, 2015) (no perm. app. filed). In *In re J.A.G.*, mother relied on DCS's failure to make reasonable efforts as preventing the trial court from terminating her parental rights. According to the Court, however: "Obviously, the parties in the case at bar did not have the benefit of the *In re Kaliyah* decision in briefing their cases. Nonetheless, the holding effectively ends [m]other's appeal in the case at bar." *Id.*; *see e.g.*, *In re Miracle F.H.*, No. E2014-01508-COA-R3-PT, 2015 WL 1539050, at *5 (Tenn. Ct. App. Apr. 1, 2015) (citing the *In re Kaliyah* holding despite the fact that the trial court entered a final order prior to the filing of the *In re Kaliyah* Opinion); *In re Agustine R.*, No. E2014-01091-COA-R3PT, 2015 WL 1259245, at *6 (Tenn. Ct. App. Mar. 17, 2015) (also applying the *In re Kaliyah* holding despite the fact that the decision was rendered while the case was pending). Thus, the Court of Appeals has previously applied the *In re Kaliyah* holding to cases that were pending when it was rendered.

[21] Despite our conclusion that the trial court did not err in this regard, we cannot condone the actions of DCS in this case. At trial, DCS caseworker Rachel Hunter testified that although she was assigned this case in June of 2014, she was unable to locate Father until October of 2014. Even after obtaining contact information for Father, Ms. Hunter testified that she declined to contact him as her office implemented a "hush hush" policy after the first hearing on the termination petition on October 24, 2014. We find it stretches credulity to suggest that, exercising minimal efforts, it would take approximately four months to locate an individual that was known to be an inmate of the Nebraska Department of Correction. Furthermore, it appears that Ms. Hunter had Father's contact information for at least some period of time before the termination hearing and in the time between the first hearing and its conclusion in the Spring of 2015. While the efforts made by Ms. Lewis to establish a suitable home for the child during her time on the case do appear to have been reasonable given the fact that Father was incarcerated, we cannot say the same for the efforts expended by Ms. Hunter.

Finally, we note that the ***In re Kaliyah*** decision was rendered on January 22, 2015. The final hearing on DCS's petition to terminate Father's parental rights occurred on April 21, 2015. Accordingly, the contention that Father's counsel was deprived of adequate trial preparation by having to address a Tennessee Supreme Court Opinion rendered nearly three months prior to the final hearing is not persuasive.

We next consider whether Father substantially complied with the requirements that he complete both a parenting class, participate in both an alcohol and drug assessment and a mental health intake and provide documentation to DCS, gain stable income, and not incur more criminal charges. Here, the testimony and documentary proof in the record shows that Father attended two parenting classes, one in 2013 and one after the termination petition was filed in 2014. Although Father testified that he completed an additional class, no documentary proof was submitted to either DCS or the trial court to support Father's testimony. In addition, only proof of the 2013 class was submitted to DCS prior to trial, and a DCS caseworker testified that because it was a short, online class, it was not sufficient to meet the requirements in the Permanency Plan. From our review, however, nothing in the Permanency Plan specifically states that a short, online parenting class is insufficient to meet the requirements of the Permanency Plan. Father also testified that he completed several mental health and drug and alcohol assessments and that there were no specific recommendations for him to follow. No documentary proof exists in the record to support Father's testimony, but there was no testimony from DCS to dispute Father's assertions.

Father also testified that although he is in prison, he has stable income and has been making payments toward the support of the child. Indeed, documentary proof in the record shows that two substantial child support payments were recently made on Father's behalf and that he is current on his Nebraska child support obligation. From our review of the record, although Father's substantial payments only began after the filing of the termination petition, it appears that he was making small, partial payments sporadically beginning in May 2013. Although these payments appeared to have been received by Mother, rather than the child, nothing in the record suggests that Father was aware that the payments were not going toward the child. Additionally, Father admitted that after the Permanency Plan was created, he was extradited to Nebraska to face charges for domestic violence, theft, and failure to appear. However, it seems likely that the crimes alleged occurred prior to the creation of the Permanency Plan, rather than after. Finally, Father admitted that he was arrested in Nebraska after January 2013 but testified without dispute that those charges were "dropped."

Mere noncompliance is not enough to terminate a parent's rights. ***In re Valentine***, 79 S.W.3d at 548. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. ***Id.*** A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. ***In re M.J.B.***, 140 S.W.3d at 656

(citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

Under the circumstances, we cannot conclude that Father's noncompliance with the requirements that he understood under the Permanency Plan was substantial. Father attended a parenting class while in Nebraska and provided proof of completion to DCS; although the parenting class was ultimately rejected as insufficient by DCS, nothing in the Permanency Plan put Father on notice of DCS's requirements for an acceptable parenting class. In addition, Father testified without dispute that he has taken part in several mental health and drug assessments. Although DCS did not receive notice of Father's completion of these tasks, this failure alone is not sufficient to constitute substantial noncompliance in this particular case. Further, despite Father's circumstances, he has obtained a job in prison and has endeavored to pay support for the child. Although the support ultimately was not sent to the child, nothing in the record suggests that this is through any fault on the part of Father. Finally, although Father admitted to being arrested after the creation of the Permanency Plan, he testified without dispute that those charges were not pursued. Accordingly, we must reverse the judgment of the trial court that clear and convincing evidence exists to support a finding that Father substantially failed to comply with the Permanency Plan.

### III. Persistent Conditions

The trial court also found that clear and convincing evidence supported the ground of persistence of conditions. According to Tennessee Code Annotated Section 36-1-113(g)(3), one ground for termination is that:

31

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

With regard to this ground, Father argues that the record does not contain "the prerequisite documentary evidence of a petition alleging dependency and neglect, an order placing the child in the legal custody of [DCS], an order finding clear and convincing evidence of the child's dependent and neglected status, and/or a petition to terminate parental rights." As previously discussed, however, Collective Exhibit #1 was properly considered by the trial court. From our review, Collective Exhibit #1 contains several petitions to find the child dependent and neglected, a January 30, 2013 order granting temporary legal custody of the child to DCS, a February 20, 2013 order finding clear and convincing evidence that the child was dependent and neglected, and the December 2, 2013 petition to terminate Father's parental rights to the child.[22] Based upon these documents, the trial court was correct in concluding that the child had been removed from Father's custody and placed in the custody of DCS for more than six months.

Father does not argue that, considering the documents contained in Collective Exhibit #1, the evidence was otherwise insufficient to support the trial court's finding of persistent conditions. In an abundance of caution, however, we have reviewed the record to determine if clear and convincing evidence supports a finding of persistent conditions. We conclude that it does.

---

[22] The petition to terminate Father's parental rights is not only included in Collective Exhibit #1 but is also part of the technical record of this case, in that it is the initiating document. The trial court is clearly entitled to consider the technical record of the case in which it is presiding. *See Mandela v. Reynolds*, No. 01-A-01-9303-CH00126, 1993 WL 236607, at *2–*3 (Tenn. Ct. App. June 30, 1993) (holding that "prior proceedings and judgments in the same court were subject to judicial notice") (citing Tenn. R. Evid. 201).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008))).

Here, it appears from the record that the child was removed from the home due to Father's and Mother's incarceration and Father's drug use. Although there is no evidence that Father is currently abusing drugs, because of Father's incarceration, we are simply unable to discern if any improvements Father has made with his drug use will continue upon his release. In addition, there is no dispute that he is incarcerated and will likely remain so until April 2017. Because of Father's current incarceration and his history of criminal acts, there is little likelihood that the child may be returned to Father's custody in the near future.[23] Thus, regardless of whether any inability on Father's part to care for the child is willful, the fact remains that Father is not capable of providing the child the care that she needs and deserves while he is in prison. Furthermore, even if we were to conclude that Father was likely to be released early from prison and that he would not pursue other criminal conduct, Father failed to provide sufficient evidence for DCS to approve the home in which Father testified he will eventually reside. Additionally, while he appears willing and able to provide support for the child while incarcerated, the testimony shows that Father let the children under his roof go hungry prior to his incarceration. Finally, any continuation of the parent-child relationship between Father and the child will prevent the child from being adopted with her siblings. Under these circumstances, the trial court did not err in finding the ground of persistence of conditions proven by clear and convincing evidence.

---

[23] At trial, Father also testified that there was a warrant out for his arrest in Tennessee. It is unclear what will become of that charge upon Father's release from incarceration in Nebraska.

## B. Best Interest

We next consider whether termination is in the child's best interest. When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee General Assembly has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

The trial court made the following finding with regard to the child's best interest:

35

[Father] has made efforts to reunify with his child[.] However, his efforts are limited by the fact that he has been incarcerated for the majority of the time since the children came into custody. In fact, his ability to exercise any type of relationship or maintain contact with the children has been virtually non-existent due to the fact that he was either under bond conditions in the State of Nebraska or incarcerated in the State of Nebraska thus prohibiting his travel back to the State of Tennessee to visit with the children.

In the interim, [the child] and her siblings have been placed into a very good foster home.

Clearly based upon the testimony of the foster parents, the DCS caseworkers and the therapist, Amber Harris, [the child] and her siblings have made tremendous progress since being placed into the current foster home.

The foster mother . . . testified that she and her spouse intend to adopt all four (4) of the children if the termination of the parental rights is granted.

Throughout the entire timeframe that [Mother] and [Father] have been away from their children in the State of Nebraska, the needs of the children, and specifically Abbigail [], have been met very well by the State of Tennessee, Department of Children's Services and by the foster parents.

Furthermore, the Court must note that the four (4) children have, as provided in the testimony, bonded and their best circumstance would be for the four (4) children to remain together. The main stability that those four (4) children have known throughout this entire process has been that they have each other.

The therapist, Amber Harris, testified that it would be detrimental to [the child] to remove her from her current placement and caretaker.

Therefore, based upon the forgoing the Court must find that it is in the best interest of the children that the parental rights of [Father] to his child  . . . be terminated.

After reviewing the record, we agree with the trial court. Here, Father has been largely removed from the child's life since January 2013. Father's only visit with the child after her removal was in February 2013. Accordingly, the child has had no contact with Father in the last two-and-one-half years. *See* Tenn. Code Ann. § 36-1-113(i)(3). Moreover, at the time of

36

the removal, the child was only two years old. Accordingly, it appears unlikely that Father and the child have any meaningful relationship at this point. *See id.* § 36-1-113(i)(4). While Father contends that any failure to maintain a relationship with this child was not voluntary, Father's inability to visit with the child results directly from his own criminal activities.

Rather than an attachment to Father, it appears that the child now has an attachment to Foster Mother, whom she refers to as "Mama." Clearly, the child has grown attached to the people that have raised her for over two-and-one-half years, longer than the time she resided with Father. Removing her at this point would certainly be detrimental to the child's well-being, as supported by the expert testimony of Ms. Harris. *See id.* § 36-1-113(i)(4). While we can speculate and hope that the child's needs may be met if returned to Father's care, the testimony undisputedly showed that Foster Parents have provided the child with not only her basic needs but the structure and therapy that she requires to thrive. In addition, the child's other siblings reside in the home, and the child is able to maintain a relationship with them.

Father has also failed to offer any documentation to DCS or the court that he can establish a safe and stable home for the child in the near future, an impossibility due to his current incarceration. Furthermore, Father testified that he has abused marijuana for his entire adult life, and nothing in his testimony indicates that he intends to discontinue this habit. *See id.* § 36-1-113(i)(7), (8).

There is also substantial concern about the abuse and neglect that the child and her siblings suffered at Father's hands. *See id.* § 36-1-113(i)(6). First, Ms. Lewis testified that the children were dirty, infested with head lice, and underfed when removed from Mother's and Father's care. There is no dispute that Father was convicted of child abuse against the children related to the events that led to their removal. In addition, Ms. Harris testified without objection to statements made by the other children concerning abuse at Father's hands, including beatings and setting their bed on fire. Ms. Harris testified that the children once lived in fear of this abuse but that they have improved with regular therapy. These factors weigh heavily in favor of termination.

We note, however, that all factors are not in favor of termination. For example, there is no dispute that since his incarceration, Father has endeavored to pay child support for the child's benefit. *See id.* § 36-1-113(i)(9). In addition, other than Ms. Lewis's attempts to help Father establish a suitable home, there is little evidence in the record that DCS provided reasonable efforts to Father to help him make a lasting adjustment in his circumstances. *See id.* § 36-1-113(i)(2). Considering all of the relevant factors, however, we must conclude that the child's best interest is served by remaining in the home that she has known for the majority of her life, where her needs are clearly met, where her other siblings reside, and

where the caregivers wish to adopt her. Accordingly, there is sufficient evidence in the record to support a finding that termination of Father's parental rights is in the child's best interest.

## Cumulative Error

Finally, Father argues that the trial court's errors, viewed cumulatively, require this Court to vacate the judgment of the trial court. We respectfully disagree. First, we note that Father cites no law to support his assertion that the cumulative error doctrine may apply to civil cases in Tennessee, and this Court has found none. Next, we cannot ignore that the trial court in this case was faced with the difficult task of presiding over the termination of parental rights of one parent who resided in prison hundreds of miles away and one parent who did not deign to appear for court. Rule 36(b) of the Tennessee Rules of Appellate Procedure provides that "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Here, the trial court provided notice to Father of its decision within thirty days of the conclusion of the trial, although a final order was not entered until a few days later. With regard to the trial court's erroneous findings, we have reversed or vacated those findings. However, our review of the record has shown that clear and convincing evidence supports several grounds for termination as well as a finding that termination is in the child's best interest. In this case, we cannot conclude that the minor errors that may have been committed by the trial court outweigh the interest in finality that must be a cornerstone of all termination of parental rights proceedings. Accordingly, we decline Father's invitation to vacate the judgment of the trial court and remand for a new trial, where the only result would be delaying the child's anticipated adoption.

## Conclusion

The judgment of the Claiborne County Juvenile Court is affirmed in part, vacated in part, and reversed in part. The termination of Travis C.'s parental rights is affirmed. Costs of this appeal are taxed to Appellant, Travis C., and his surety.

_____
J. STEVEN STAFFORD, JUDGE

38